IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

## STATE OF TENNESSEE v. LARON RASHAWN LUMPKIN

**Appeal from the Criminal Court for Davidson County**
No. 2017-A-390    Steve R. Dozier, Judge

——————————————————————

### No. M2019-01912-CCA-R3-CD

——————————————————————

Indicted for felony murder and especially aggravated robbery, Defendant, Laron Rashawn Lumpkin, was convicted by a jury of voluntary manslaughter and especially aggravated robbery.  The trial court imposed a sentence of five years for voluntary manslaughter and twenty years for especially aggravated robbery to be served concurrently for an effective twenty-year sentence in the Department of Correction.  On appeal, Defendant argues that the evidence was insufficient to support his convictions.  After a thorough review of the record, we affirm Defendant's conviction for especially aggravated robbery but reverse and vacate his conviction for voluntary manslaughter.  In doing so, we impose a conviction for the lesser-included offense of reckless homicide and remand the case to the trial court for a sentencing hearing on the newly imposed conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
Affirmed in Part; Reversed and Vacated in Part; Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. NORMA MCGEE OGLE, J., concurring in part and dissenting in part.

Jay Umerley, Nashville, Tennessee (on appeal) and Matthew Dunn, Nashville, Tennessee (at trial) for the appellant, Laron Rashawn Lumpkin.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King and Chandler Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Background*


Jerry Honeycutt testified that his son, Jacob Honeycutt, and the eighteen-year-old victim were best friends. Jerry Honeycutt testified that he saw the victim almost every day, and the victim was like a son to him. On the afternoon of April 2, 2016, the victim drove Jerry Honeycutt, Jacob Honeycutt, Jerry Honeycutt's fiancée Jennifer Earps, and Ms. Earps' twelve-year-old son to the Hooters restaurant located on Harding Place in Antioch in the victim's Dodge car to celebrate the victim's first paycheck from working at Domino's Pizza and to celebrate his high school graduation. The victim parked in the rear parking lot of the restaurant because the front parking lot was full. Jerry Honeycutt testified that he got out of the backseat of the car after they arrived at the restaurant and waited for the other passengers and the victim to exit the vehicle. He said that the victim was sitting in the driver's seat counting the money in his wallet to determine whether he had enough cash to last two weeks. Jerry Honeycutt told the victim not to worry and that he would cover the cost of the meal. At that point, Defendant approached the victim's car and asked Jerry Honeycutt and the victim if they had a "light." The victim and Jerry Honeycutt both told Defendant no, and he left. Mr. Honeycutt did not see Defendant in possession of any money or a weapon at the time.


Defendant returned to the victim's car minutes later with two other men, one of whom was wearing a hoodie. All three men were armed with handguns. Jerry Honeycutt testified that he was standing outside the car, and the victim and all of the other passengers were still inside the car. He said that Defendant pointed his weapon at the front of the victim's head, and the man who was wearing a hoodie held his gun to the back of the victim's head, and they said, "Give me everything you got." The third man pointed a .32-caliber semi-automatic weapon at Jerry Honeycutt's stomach and said, "You think this is [a expletive] game?" Jerry Honeycutt testified that he told the victim to give the men everything that he had. He said:

> [The victim] handed them wallet and all. And everything - - he was handing them everything, and then they said, "And the iPhone 6 too," and then the N-word. And he reached in there and when he reached in because [the victim] had it under his leg, in between his legs, when he reached in to grab it, that's when [the victim] punched him.
>
> And when [the victim] punched him, the guy that had the gun in my stomach, took that gun out, run up behind [the victim], and that's when I heard "pow" and I took off. I didn't know whether he had been hit at that time or not.

Jerry Honeycutt thought that he shut the back-passenger door to the car and ran toward the Hooters restaurant screaming for help. As Jerry Honeycutt approached the restaurant, he saw Defendant and the other two men in a black Mercedes who appeared to be driving toward him. He began "zigzagging" through the parking lot because he was afraid that the men would shoot him as well. He saw the car leave the parking lot. Jerry Honeycutt ran back to check on his family and the victim. He was accompanied by a nurse and her husband, a former police officer, who had just left the restaurant, and someone called 9-1-1. Jerry Honeycutt and the couple pulled the victim from the car, and Jacob Honeycutt, Ms. Earps, and her son were still inside the car. The victim was bleeding from his head, and the 9-1-1 operator instructed Jerry Honeycutt to apply pressure to the wound. The nurse also attended to the victim, and he was eventually transported to the hospital by ambulance. He died two days later.

It was determined that the victim died of a gunshot wound to the head, and the manner of death was homicide. Dr. Thomas Deering, the medical examiner, testified that the bullet entered the victim's left temple, penetrated his brain, and lodged in the victim's right maxillary near his cheek. Dr. Deering also observed a soot ring near the entrance wound which indicated that the barrel of the gun was directly on the victim's skin as it was fired.

Jerry Honeycutt testified that he had never met Defendant or either of the other two assailants prior to the shooting. He said that Ms. Earps' daughter found a photograph of Defendant and the other two men on Snapchat and showed it to Jerry Honeycutt. In the picture, Defendant and the other two men were wielding guns and smoking marijuana. Jerry Honeycutt conveyed the information to police. He also identified Defendant from a photographic lineup. He said that no one in the victim's car was armed at the time of the shooting, and they did not go to Hooters to conduct a drug transaction.

Jennifer Earps' testimony concerning the events leading up to the shooting was similar to that of Jerry Honeycutt. She testified that one of the three assailants shot the victim when he refused to give them his iPhone 6. Ms. Earps was not sure who shot the victim. She said that Jacob Honeycutt ran from the car after the victim was shot, and she and her son ran from the car after the assailants left. Ms. Earp spoke with police and later identified Defendant from a photographic lineup. She testified that no one in the victim's car had a weapon, and they did not go to Hooters in Antioch to sell marijuana. Ms. Earp testified that her daughter had shown her a photograph of Defendant from a social media page. She did not know Defendant or any of the other two assailants before the shooting.

Jacob Honeycutt's testimony was also similar to that of Jerry Honeycutt and Ms. Earps. Jacob Honeycutt testified that he did know any of the three individuals who approached the victim's car prior to the shooting. He said that he saw one of the individuals take money from the victim's hand. Jacob Honeycutt testified that the victim was scuffling with the men after they asked for the victim's iPhone 6. He clarified that

the victim "maybe swung one time" when one of the men reached for the phone. The victim was then shot in the back of the head. Jacob Honeycutt testified that he ran from the car toward Hooters. He later returned to the car and saw the victim slumped over in the driver's seat. He then called 9-1-1. Jacob Honeycutt testified that he saw Defendant's picture on an Instagram post but he was unable to identify Defendant from the photographic lineup. He did not recall any conversation about marijuana prior to the shooting. Jacob Honeycutt admitted that he and the victim occasionally smoked marijuana together.

Co-defendant Lorenzo Montelier-Avila testified that he drove to Defendant's house on Brenda Lane after work on April 2, 2016. It was Defendant's seventeenth birthday. Approximately one to two hours later, Jamez Bledsoe-Conley and someone named "Jay" arrived at Defendant's house. Co-defendant Montelier-Avila testified that the two men and Defendant had guns and began taking pictures with the weapons and wishing Defendant happy birthday. He said that Defendant had a .38-caliber revolver in his possession. He thought that Mr. Bledsoe-Conley had a .32-caliber semiautomatic pistol, and Jay had a nine-millimeter semiautomatic handgun. Co-defendant Montelier-Avila testified that he did not have a gun at the time but took selfies with the other men's guns. He said that everyone put their weapons away when Defendant's step-father returned from the store. Co-defendant Montelier-Avila testified that Defendant did not have a functioning cell phone so Co-defendant Montelier-Avila allowed Defendant to use his cell phone to call the victim.

Co-defendant Montelier-Avila testified that he drove Defendant, Jay and Mr. Bledsoe-Conley in Co-defendant Montelier-Avila's black Mercedes to the Hooters restaurant at Harding Place in Antioch to meet the victim for Defendant to "pick up weed." The four men had pooled their money together for a total of three hundred dollars before they left, which Co-defendant Montelier-Avila had in his possession. Co-defendant Montelier-Avila testified that he did not know the victim, and he only knew that Defendant and the victim had been calling and texting each other with Defendant using Co-defendant Montelier-Avila's cell phone. Co-defendant Montelier-Avila parked in the back-parking lot of the restaurant, and Defendant got out of the car. Defendant did not take the money with him at that time. Co-defendant Montelier-Avila testified that Defendant returned to the car a few seconds later and took the three-hundred dollars out of the vehicle. Mr. Bledsoe-Conley and Jay also got out of the car and walked away with Defendant. Co-defendant Montelier-Avila testified that he was checking his phone and listening to music when he heard a gunshot and saw Defendant, Jay, and Mr. Bledsoe-Conley running toward the car. He said that the three men got into the car, and Co-defendant Montelier-Avila drove back to Defendant's house where Defendant, Jay, and Mr. Bledsoe-Conley got out of the car. Co-defendant Montelier-Avila testified that he then drove to his house, parked the car, and walked back to Defendant's house. He said that a party had started by the time he returned to Defendant's house, and he saw Defendant with a bag of marijuana. Co-defendant Montelier-Avila testified that he never

saw the three-hundred dollars again, and he denied that Defendant, Jay, or Mr. Bledsoe-Conley pointed a gun at him or threatened him on the drive back to Defendant's house from Hooters.

Courtney Bouchie, a crime scene investigator for the Metropolitan Nashville Police Department, testified that she processed the scene at Hooters restaurant. She collected a .32-caliber cartridge casing from near the rear driver's tire of the victim's car and a small amount of a green leafy substance from near the front driver's tire of the car. Ms. Bouchie was also called out to Defendant's residence on Brenda Court to photograph and collect a revolver that had been located in the left corner of the garage.

Detective Desmond Sumerel of the Metropolitan Nashville Police Department testified that he was assigned as the lead detective in this case. The victim had already been transported to the hospital when he arrived on the scene. He noticed a shell casing on the ground beside the victim's car, and he saw a small bag of what appeared to be marijuana on the ground toward the front of the car. Detective Sumerel testified that while Hooters had surveillance cameras, none of those cameras pointed to the back-parking lot. Another detective was able to obtain video surveillance footage from a motion-activated camera located at the bakery directly behind Hooters which captured a portion of the parking lot. The video clips were played for the jury.

On the surveillance video clips, the victim's car arrived in the parking lot at 7:02 p.m. on April 2, 2016, and a black Mercedes arrived at 7:04 p.m. There was one person standing outside the back door on the driver's side of victim's car, and an individual got out of the driver's side of the black Mercedes approximately one-minute later and approached the victim's vehicle. The individual then walked back to the black Mercedes, interacted with someone in the car, and two other individuals got out of the car. Three individuals walked back to the driver's side of the victim's car at 7:07 p.m. The person who was standing beside of the victim's car was still standing there. Detective Sumerel testified that the video clips then showed some type of altercation at the driver's side of the victim's car. He further testified:

> It appears that the person who had been standing at the back driver's side door or the passenger door on the driver's side ran to the right as you are looking at the video, and the three people who had walked up from the black car fled back to their black Mercedes car and got into it and drove away.

Detective Sumerel noted that the black Mercedes left the parking lot by 7:12 p.m. The remaining surveillance video clips showed the individuals who assisted the victim after he was shot.

Detective Sumerel testified that he also obtained the call detail records from Co-defendant Montlier-Avila's cell phone. The records showed that a call was made to the victim's phone at approximately 5:01 p.m. on April 2, 2016. Thereafter, multiple calls or texts were made between Co-defendant Montelier-Avila's phone and the victim's phone beginning at 6:54 p.m. The final call from Co-defendant Montelier-Avila's phone was made at 7:14 p.m. Detective Sumerel testified that the victim's wallet was recovered from the scene but it did not contain any money. The victim's cell phone was also located in the driver's area of the car. Detective Sumerel testified that he showed a photographic line-up to Jerry Honeycutt and Ms. Earps on April 3, 2016, and they identified Defendant as being involved in the shooting. He also showed a photographic lineup to Jacob Honeycutt on April 4, 2016, but he was unable to identify anyone. Detective Sumerel testified that he was never able to determine the identity of the person named "Jay."

The parties stipulated at trial that Bridgett Chambers, a forensic scientist employed by the Metropolitan Nashville Police Department Crime Scene Laboratory and qualified as an expert in firearms and tool mark analysis, performed an analysis of the .32-caliber automatic cartridge case recovered from Hooters parking lot. She also analyzed the bullet recovered from the right side of the victim's face, and determined that it was a .32-caliber bullet.

Kainen Young testified that he was fifteen years old in April of 2016. He knew the victim through a friend, and he had known the victim for approximately one or two months before the victim's death. Mr. Young said that he only interacted with Defendant through text messages concerning some shoes that Mr. Young had for sale on social media. Defendant also asked Mr. Young about buying some marijuana, which Defendant referred to as "tree," for an upcoming party. Mr. Young testified that he gave Defendant the victim's phone number because the victim had marijuana to sell. Mr. Young said that he, the victim, and "Nick" were supposed to meet Defendant at the Ashland City Walmart in Cheatham County. However, Defendant backed out of the meeting. Mr. Young testified that he accompanied the victim to Walmart because Mr. Young had just met Defendant and did not trust him. He was aware that the victim had planned to meet Defendant in the next one to two days at the Hooters restaurant in Antioch to sell marijuana to Defendant. Mr. Young planned to meet the victim later that night on April 2, 2016. He called the victim numerous times but he did not answer. Mr. Young later learned that the victim had been shot and was hospitalized. He attempted to reach out to Defendant on Instagram to see what had happened, but he was blocked from Defendant's page.

*Analysis*

Defendant argues that the evidence was insufficient to support his convictions for especially aggravated robbery and voluntary manslaughter because the State did not adequately establish his identity as the perpetrator of the offenses.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). Because the jury's verdict replaces the presumption of innocence with one of guilt, the burden on appeal is shifted onto Defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Thus, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). Questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The State has the burden of proving the identity of Defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995). The identification of Defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, ... based upon the conduct of another person." *State v. Lemacks,* 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or

assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2010). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

As for Defendant's conviction for especially aggravated robbery, the evidence presented at trial was sufficient to support the conviction and establish Defendant's identity as the perpetrator of the offense. Our criminal code defines especially aggravated robbery as follows: "Especially aggravated robbery is robbery as defined in [section] 39-13-401: (1) Accomplished with a deadly weapon; and (2) Where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). Robbery as defined in Tennessee Code Annotated section 39-13-401 is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Serious bodily injury means bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member or organ. *Id.* § 39-11-106(a)(34).

Viewing the evidence in a light most favorable to the State, the proof shows that Defendant was supposed to meet the victim at the Hooters restaurant in Antioch to purchase marijuana. Jerry Honeycutt testified that Defendant walked up to the victim's car in the parking lot and asked him and the victim for a "light." Defendant left and then returned to the car moments later with two men identified as Jamez Bledsoe-Conley and "Jay." All three men were armed with handguns. Mr. Honeycutt, Jennifer Earps, and Jacob Honeycutt all identified Defendant as the person who pointed his gun, a .38-caliber revolver, at the front of the victim's head as the victim sat in his car counting the money in his wallet. From the testimony, the jury could have inferred that Jay held his gun, a nine-millimeter semiautomatic handgun, to the back of the victim's head, and the two men said, "Give me everything you got." The jury could have further inferred from the testimony that Mr. Bledsoe-Conley held his weapon, a 32-caliber semiautomatic pistol, to Jerry Honeycutt's stomach and said, "You think this is a [expletive] game?" The victim gave the men his wallet, and one of the men took the victim's money from the victim's hand. The man also demanded the victim's iPhone, which the victim had placed between his legs. The victim punched the man when the man reached for the iPhone, and Mr. Bledsoe-Conley ran up to the victim and shot him in the head. The victim suffered serious bodily injury, and later died from his wound. From these facts, the jury could

reasonably find that Defendant was guilty of especially aggravated robbery as a principle offender or under a theory of criminal responsibility.

Concerning sufficiency of the evidence for Defendant's voluntary manslaughter conviction, we note that Defendant was originally indicted for the offense of felony murder and was convicted of the lesser-included offense of voluntary manslaughter. The supreme court in *State v. Parker*, 350 S.W.3d 883 (Tenn. 2011) set forth the following:

> [W]hen reviewing a convicted defendant's claim that the evidence is not sufficient to support his or her conviction, the review must be undertaken with respect to the crime of which the defendant was convicted, not the crime with which he was charged. *See* [*Jackson v. Virginia*, 443 U.S. 307, 324 n. 16 (1979)](stating that the standard of review "must be applied with explicit reference to the substantive elements of the criminal offense [challenged] as defined by state law"). That the proof may support conviction of a different, even a "greater," offense does not obviate the constitutional requirement that the proof support each and every element of the offense for which the defendant was *actually* convicted.

*Id*. at 907 (*emphasis in original*). "Comparing the revised second degree murder and voluntary manslaughter statutes, the essential element that now distinguishes these two offenses (which are both "knowing" killings) is whether the killing was committed "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. [Tenn. Code Ann. § 39-13-211(a)]." *State v. Williams*, 38 S.W.3d 532 (Tenn. 2001).

In this case, we find that the evidence is insufficient to support Defendant's conviction for voluntary manslaughter but for a different reason than the one set forth by Defendant in his brief. As with his especially aggravated robbery conviction, Defendant argues that the evidence was insufficient to adequately establish his identity as the perpetrator of the offense. The proof overwhelmingly supports Defendant's identity as a perpetrator of the victim's homicide. In fact, if the jury had convicted Defendant of either felony murder or second degree murder, the evidence would have supported either of those convictions. However, we are obligated to follow our Supreme Court's holdings in *Parker* and *Williams*. Voluntary manslaughter includes the essential elements that the person who shot the victim:

(1) Acted in a state of passion;
(2) Produced by adequate provocation;

- 9 -

(3) That was sufficient to lead a reasonable person to act in an irrational manner.

Tenn. Code Ann. § 39-13-211(a).

Defendant rested without offering any proof. No evidence, direct or circumstantial, was introduced at trial to support a conclusion that the perpetrator who shot the victim in the head acted in a state of "passion," produced by "adequate provocation," which was legally sufficient to cause a reasonable person to act in an irrational manner. If we were to conclude that the victim's resistance to Defendant reaching to take the victim's phone, without any other evidence of the shooter's state of mind, supported this element of voluntary manslaughter, it would be precedent to require trial judges to instruct voluntary manslaughter as a lesser-included offense whenever a homicide victim offers any resistance to a robbery.

The evidence is sufficient though to support a conviction for the next appropriately charged lesser-included offense of reckless homicide, which is "a reckless killing of another." Tenn. Code Ann. § 39-13-215.

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31). The evidence is also sufficient to support Defendant's identity as the perpetrator of the offense under a theory of criminal responsibility. Therefore, we reverse and vacate Defendant's conviction for voluntary manslaughter and remand this matter to the trial court for entry of an amended judgment reflecting a conviction for reckless homicide and for resentencing on this modified conviction.

## CONCLUSION

Based upon the foregoing, we affirm Defendant's conviction for especially aggravated robbery but reverse and vacate his conviction for voluntary manslaughter. In doing so, we impose a conviction for the lesser-included offense of reckless homicide and remand the case to the trial court for a sentencing hearing on the newly imposed conviction. We affirm the judgment of the trial court in all other respects.

_____

THOMAS T. WOODALL, JUDGE